UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES CARR,

                 Petitioner,

      -vs-

SUPT. DANIEL SENKOWSKI,

                 Respondent.
_____

**REPORT AND RECOMMENDATION
No. 01-CV-689(JTE)(VEB)**

## I.      Introduction

James Carr ("Carr" or "petitioner") filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his January 28, 1997 conviction in New York State Supreme Court (Erie County) on charges of felony murder and first degree robbery. *See* Docket No. 1. This matter has been referred to the undersigned for the issuance of a Report and Recommendation regarding the disposition of Carr's habeas petition. *See* Docket Nos. 12, 20.

## II.     Factual Background and Procedural History

The conviction here at issue stems from Carr's involvement in the stabbing death on July 2, 1993, of eighty-one year-old Percy Blake Saunders ("Saunders" or "the victim") in his home on Highland Avenue the City of Buffalo. In July of 1993, Carr had confessed to burglarizing Saunders' home in early July 1993 although he claimed that Saunders was not at home at the time of the burglary and that he had no involvement in the murder. In August 1994, Carr was tried and convicted on one count of second degree burglary in Erie County Supreme Court (Wolfgang, J.), and sentenced to an indeterminate term of twelve and one-half to twenty-five

years to life. While subsequently detained at the Erie County Holding Center, Carr made

statements inculpating himself in the Saunders' murder to Antonio James ("James"), with whom

he shared a cellblock. James, who was currently serving jail time on criminal charges, contacted

the assistant district attorney and agreed to testify for the prosecution in exchange for certain

benefits, including a reduction in his sentence, recommendation for admission to a work-release

program, and a letter to the parole board informing it of James' cooperation in regard to

petitioner's case.

Thereafter, the prosecutor re-presented Saunders' murder to an Erie County Grand Jury

based on James' testimony concerning Carr's jailhouse admissions. The grand jury returned

Indictment No. 93-1584-002 charging Carr with one count of murder in the second degree

(intentional murder) (N.Y. Penal Law § 125.25(1); two counts of second degree murder (felony

murder) (N.Y. Penal Law § 125.25(3)); one count of burglary in the first degree (N.Y. Penal Law

§ 140.30(2)); one count of robbery in the first degree (N.Y. Penal Law § 160.15(1)); and one

count of criminal possession of a weapon in the third degree (N.Y. Penal Law § 260.15). The

underlying felonies supporting the felony murder charges were first degree robbery and first

degree burglary. The factual predicate for the 1996 charge of first degree burglary stemmed from

Carr's confession to unlawfully entering the victim's house around the time of the murder with

intent to steal money, and his subsequent conviction of one count of second degree burglary in

August 1994.

Carr's jury trial was conducted in Erie County Supreme Court (Wolfgang, J.) in

November 1996. On November 20, 1996, prior to trial, defense counsel moved to dismiss the

count in the 1996 indictment charging Carr with first degree burglary for the same incident for

which he was convicted in 1994. T.37. The prosecutor agreed to withdraw that charge of first

degree burglary. T.37. The prosecutor argued, however, that the remaining charges, and in

particular the felony murder-burglary count, did not violate the Double Jeopardy clause:

> Judge, we believe that under [New York Criminal Procedure Law ("C.P.L.")]
> 40.22(a) that that section is authority for prosecution for the following reasons:
> That subdivision allows for a prosecution when the elements are substantially
> different and the acts are clearly distinguishable [in] the law, Your Honor, at
> *People v. Berzups*, 49 NY 2d 417[1] as well as *People v. Lucas*, 105 AD 2d 545,[2]
> those cases undeniably state that when you have a felony the underlying felony as
> regards the felony murder[,] they're distinct; in other words, if it's a felony murder
> burglary case the underlying burglary is separate and distinct from the felony
> murder itself because of the following: The body of the crime of burglary, Judge,
> relates to an unlawful entry with intent to commit a crime and the cases are clear
> that that crime is complete once unlawful entry is made with that unlawful intent.
> In the case of this indictment you have a situation where as soon as according to
> the People's theory, the defendant climbs through the rear window, that burglary
> is completed.

---

[1]     "[W]e hold that the underlying felony of the felony murder charge was not a lesser included offense that merged in the conviction for which it was the predicate. Although an extremely literal reading of the statutes defining lesser included offenses might suggest that felony murder be treated as nothing more than a felony with certain aggravating factors, namely the killing of a nonparticipant, the two crimes are substantively and generically entirely separate and disconnected offenses. In contrast to the usual lesser included offense situation, in felony murder the underlying felony is not so much an element of the crime but instead functions as a replacement for the *mens rea* or intent necessary for common-law murder. This view accords with the historical development of the felony murder doctrine and the legislative policy reflected in its current statutory descendant, both of which underscore the fact that the corpus of the crime is the killing of another." *People v. Berzups*, 49 N.Y.2d 417, 427 (N.Y. 1980) (internal citations, quotations, and quotation marks omitted).

[2]     "Defendant was indicted . . . on charges of robbery, kidnapping, intentional murder and felony murder. . . After separate jury trials, defendant and [his co-defendant] were convicted of the crimes charged in the indictment. On defendant's appeal, this court affirmed the murder convictions, but vacated the robbery and kidnapping convictions on the theory that they merged into the felony murder. . . . Defendant was retried on the intentional murder and felony murder counts of the indictment, and he was convicted of both counts. . . . As the basis for several of the alleged errors, defendant points to this court's prior dismissal of the counts of the indictment charging robbery and kidnapping, defendant claims that he was improperly retried on the original indictment. . . . Defendant also argues that the principle of double jeopardy barred retrial of the felony murder count since the robbery and kidnapping charges dismissed by this court served as the underlying felonies. Fundamental to the prohibition against double jeopardy is a determination going to factual innocence, and this court's dismissal of the robbery and kidnapping charges clearly did not constitute such a determination. In any event, felony murder and the underlying felony are substantively and generically entirely separate and disconnected offenses. Thus, even a determination of factual innocence of the underlying felony will not bar a retrial of the felony murder count." *People v. Lucas*, 105 A.D.2d 545 (App. Div. 3d Dept. 1984) (citing, *inter alia*, *Matter of Pastrana v. Baker*, 55 NY2d 315, 319 (N.Y. 1982); *People v. Berzups*, 49 NY2d at 427) (internal citations, quotation, and quotation marks omitted)).

Obviously the crime of murder, in this case[,] Mr. Saunders was found in his upstairs bedroom, the murder would have to be completed well after entry, non simultaneous with entry but well after it. And if you examine those cases you would find that there is authority for allowing a prosecution for felony murder under the burglary theory as well as the robbery theory and so I would just ask you to look at those cases and you will see that they say that there is a factual distinction and that, therefore, we should be allowed to prosecute and that only makes sense, Judge, you have a situation where the felony is committed and there is not enough proof of a murder.

The defendant should not be benefited [sic] by the fact that it took us a long time to uncover evidence legally sufficient to prosecute him. So this isn't a case where we had the evidence of the felony murder before we indicted him for the burglary; it was not until after that burglary indictment did we learn of admissions that this defendant made to witness Antonio James [the jailhouse informant]. So it's not like we were holding back, and prosecuted him on the burglary and then went back and prosecuted him for the murder when we had enough proof all along.

T.37-40.[3] Defense counsel argued that because Carr had already been convicted of burglary, it was improper for him to be charged with felony murder-burglary, stating that the prosecution "really want[ed] to litigate the same issue, it's the same acts, the same episode, the same transaction." T.41-42. Defense counsel contended that the felony murder-burglary charge should be dismissed on that basis. T.42-43.  The trial court ruled as follows:

Based upon the case law as I read it, the cases that have been cited and the progeny of those cases, it would appear to be correct that the felony murder count [based on burglary] still is valid and is not double jeopardy and the [first degree] burglary will be dismissed pursuant to motion or agreement of both parties actually[,] and the indictment for purposes of submitting the case to the jury, the numbers I think will be renumbered so that we don't cause any questions, the first count will be charged murder in the second degree, the second count will be charged robbery in the second [sic] degree,[4] the third count will be murder in the second degree, the fourth count will be murder in the second degree, and the fifth

---

[3]     Citations to "T.__" refer to the trial transcript.

[4]     Indictment No. 93-1584-002 charged Carr with first degree robbery, not second degree robbery, and he was convicted of first degree robbery.

-4-

count will be criminal possession of a weapon[.]

T.43.

At trial, Jean Allen Horth ("Horth") testified for the prosecution that she worked as housekeeper for Saunders. On July 1, 1993, she left his house at 7:30 p.m. after completing her duties. That night, she served him two vodka martinis in the living room. Saunders carried a wallet, and paid her in cash taken out of his wallet. On the night of the incident, Saunders had told her that he was going out. That was the last night she saw him. *See* T.94-137.

Carol Weise ("Weise") also worked as a housekeeper for Saunders in July 1993. When she arrived for work on July 2, 1993, she discovered Saunders "laying on the floor on his back, covered in blood." T.156. She did not know if he was breathing; he was not responsive to her. *Id.* Weise ran and called 911. *Id.* Weise testified that when she went back inside the house with the police officers, she noticed a handprint on a window in the rear of the house; she did not recall ever seeing it before. T.167. A knife used by Weise for boning chicken and cutting vegetables was kept in a sheath on the ledge by the back of the stove. T.174. On the day of the incident, it was found on the chair in the pantry; Weise had no idea how it got there. *Id.* In addition, a gun that Saunders kept in his bedroom dresser was missing on the night of the incident. T.177. Weise admitted on direct examination that on one occasion, Saunders "jokingly asked her . . . [t]o go to bed with him." T.178. He never offered her money for sex, and their relationship was nothing more than that of employer–employee. *Id.*

Officer Crespo of the Buffalo Police Department, and his partner were the first to respond to the 911 call on July 2, 1993. Clutched in the victim's hand was a blank check, an automobile club card, and a business card from an attorney. T.243; *see also* T.235-46.

Officer Masecchia of the Buffalo Police Department found that the screen on a lower rear window of the victim's house "appeared to be ajar and pushed up." T.258-59. A fingerprint was lifted from the window and it was found to be a match with Carr's left thumbprint. T.264. Officer Masecchia found neither any guns in his search of the victim's house, nor any knives outside of the kitchen area. T.259. On July 26, 1993, Officer Masecchia interviewed Carr at the police station. After Carr waived his rights under *Miranda*, he gave a statement which was memorialized in writing. In it, Carr denied knowing the victim or anything about the homicide, and denied any involvement in the incident. After Carr signed this statement,[5] Officer Masecchia confronted Carr with the fact that his fingerprint had been found on a window at the victim's

---

[5]    Carr's first written statement read, in pertinent part, as follows:   "Mr. Carr, did you understand each of the rights that were just given to you? Yes. And you signed your rights card, correct? Yes, I have. Did you wish to make a sworn statement to us at this time? Yes, I will. Do you read and write? Yes, I do. How far in school and where did you go to school? I got my GED at Elmira. The Buffalo Police Department . . . is investigating the death of Mr. Percy Blake Saunders, white male, eight-one years old, found dead at his home at 6:33 p.m. on Friday, July 2, 1993. Can you tell me in your own words what you know about the homicide . . . ? I don't know anything about it. Did you ever know Mr. Percy Blake Saunders? No. Have you ever done any handiwork for Mr. Percy Blake Saunders? No. Have you ever been to Mr. Percy Blake Saunders' home located at 58 Highland Avenue in the City of Buffalo? No. Can you tell me where you were on the weekend of July 2nd until July 4, 1993? I know where I was at from Friday until Tuesday, until that day, that would be July 6, 1993. Where were you at from Friday until Tuesday. I was spending the weekend with my family, me and my son. Who did you visit with? My aunt Ella Jones. Where does she live? 246 Ontario Street in Lockport. . . . Before you left Buffalo, what time did you leave from Buffalo? I believe it was around noon, I was picked up by Melvin Henry and his wife Patricia. What did they do when they picked you up? They picked me up and then went over to Holland Place and picked up my son. Who did you see to pick up your son, Casidus? I picked him up from Gloria Mack. Where did you learn about the homicide? I read it in the paper. In fact, I read it in the Buffalo paper, they get in Lockport. I just read that it was on Highland Street and the guy was a lawyer or something. Did you do any handiwork on any homes on Highland Street in Buffalo? The last handiwork that I did was on Leroy, I painted a church for Reverend Hayes. Do you have any friends on Highland? No, I don't even know where it is at. Have you ever been to any elderly white male's home on the West Side near West Utica Street? No. How long have you lived on West Utica Street? About three months and one-half. Does anyone live with you? I live alone. Did you kill Percy Blake Saunders? No. Do you know who killed Percy Blake Saunders? No. Would you be willing to have a search of your residence? Yes. Are you willing to have us search your residence and will you sign a permission to search form for us? Yes. Mr. Carr signs form at 4:20 p.m. Did you ever meet Percy Blake Saunders at a bar named Faherty's? No. Do you go there? Yes. Would you be willing to take a polygraph on this homicide? Yes. Is there anything that you wish to tell us right now that I have not asked you about this homicide? Not that I can think of. I am not [sic] going to show you a picture of a white male, Mr. Percy Blake Saunders, . . . and ask you if you recognize that white male? No, I don't know him. Will you sign the back of that picture? Yes, I did. Is there anything else that you wish to add? No, not really. . . . Is there any corrections that you wish to make? Yes, on Page 2 the second Buffalo should be Lockport. Is this statement now correct? Yes. Will you now sign this statement for me now? Yes, I will."  T.281-86.

house. T.273. Carr then gave a second written statement,[6] admitting to being inside the victim's

home prior to the incident. He stated the entered the house through the rear window with the

intent of stealing money, but he stated that he found no money in the house and took nothing.

Carr stated that nobody was home at the time and he denied committing the murder. T.288. Carr

was read, and waived, the *Miranda* warnings before giving the second statement. T.289. After

Carr reviewed the second statement, he indicated that it was correct but stated that he did not

want to sign it until he consulted with a lawyer. T.296-97. Carr's interview with the police

terminated at that point.

Nicole Dauria ("Dauria"), who lived at 62 Highland Avenue, testified that on July 2,

1999, she heard "rustling noises in [her] backyard" during the early morning hours. T.374-75.

She looked out of the window but did not see anybody. T.376.

---

[6]     The second statement given by Carr read, in relevant part, as follows: "Is there anything that you
would like to add to your statement right now? Yeah. I can add the details of the burglary. Did you burglarize the
home at 58 Highland Street in Buffalo, New York? Yes. When did you burglarize the home at 58 Highland Street? I
am not sure of the date. Was it before you went to Lockport? Yes. You went to Lockport on Friday. How many hours
was it after the burglary? It would have been days. I am not sure. How did you gain entry into the house on 58
Highland Street? Through the window. What side of the house was this on? In the back. Did you have to break the
window or do anything to gain entrance? I took the screen out. The window was already open. how did you get in
through the window? I had to climb in. Did you use anything to get in? No, nothing, just pushed the screen up and
pushed the window open. Did you use anything else? I used a chair to stand on. When you got into the house what
did you do? I looked around for money. I just searched around for money. Did you go into any drawers at all? Yes.
What did you go into drawers and where was this at in the house? Downstairs at first. What was it? A desk. Where's
the desk located at? Near the front downstairs. Is it next to the stairs? Yes. Did you go upstairs? Yes. Did you take
anything from the desk? Just change, that's all. Did you take anything else at this house? No. Did you go upstairs?
Yes. Did you encounter Mr. Percy Blake Saunders? No, there was nobody in the house. What did you do upstairs? I
looked in a couple of the drawers. Did you take anything from up there? No, there was no change there, nothing.
What did you do next? Came back downstairs and started to get nervous because all the lights were on. I left out of
the back door. You said the lights were on. Was it dark at this time? It was at nighttime. When you left for Lockport
you were not running from anything, were you? No. Do you know exactly what day you committed this burglary?
No, I don't. It was in the beginning of July, correct? I am not sure. It could have been June. Did you kill Percy Blake
Saunders? No. Did you tell anyone about this burglary? Carl Cheatham. Did you take Carl Cheatham back to the
house? No, I only went there once. After seeing that there was nothing there I just left. Is there anything else that you
wish to add to this statement? No."  T.296-97.

Officer Smardz of the Buffalo Police Department testified that he found no footprints in the ground underneath or near the window where the fingerprint allegedly belonging to petitioner had been obtained. T.404. The only physical evidence recovered was a wallet on the top of the bed. Strewn across the bed sheets were one of the victim's blank checks, some personal notes and a payment coupon. There also was a blank personal check, an automobile club card, and a business card found in the victim's hand. T.408-09. Currency in the amount of $185 was found in the dresser in the bedroom where the victim's body was discovered. T.417. The only fingerprint found was a "cold print" on the window of the house, later identified as matching the left thumbprint of petitioner. T.429-35.

When Officer Stambach of the Buffalo Police Department arrived at the crime scene, he noticed the handprint on the rear window of the house, which was at about his arm's length when he was standing in front of the window. T.537-38. There was no sign of damage to the window or forced entry. T.539. Officer Stambach testified that as he was driving petitioner past 58 Highland Avenue after the consensual search of petitioner's house, petitioner volunteered that he had burglarized that house. T.554.

James Otey ("Otey"), an acquaintance of the victim, knew each other from frequenting Elmwood-area bars such as Excel's and Faherty's. T.4976. On the night of July 1, 1993, between 9:00 and 10:00 p.m., Otey saw Saunders at Faherty's Bar. He identified Richard Carson ("Carson") as being at Faherty's as well. Otey also had seen petitioner "[p]robably once or twice" in the Elmwood area and had seen Carson "a bunch of times[.]" T.500. That night, Otey saw Carson and petitioner standing at Faherty's about ten feet from Saunders. T.501. Otey related that Carson was "a troublemaker" and "rob[bed] some old people . . . in [a] building where [he] used

to work[.]" T.501. (The police were never able to locate Carson to question him about Saunders'

death. T.575.) Otey left the bar at about 2:00 a.m. and did not see the victim again. T.503.

Antonio James ("James") was incarcerated at the Erie County Holding Center with

petitioner in August 1994. T.616. He testified that he spoke with petitioner, who said that he

"tricked the district attorney named Joe Marusak in the grand jury." T.617. Petitioner said that

the grand jury "found him guilty for the burglary" of Saunders' house but that he "had beat [sic]

the murder charge . . . [i]n the grand jury." T.618. James testified that he previously had known

Joe Marusak ("A.D.A. Marusak"), the prosecutor trying petitioner's case, because he had "helped

[him] on a case before." *Id.* After petitioner mentioned Marusak's name to him, James said, "I

had Joe Marusak for a case." T.619. Petitioner also told James that he "stabbed [the victim]

multiple times, he died in the back of the house and he had a check in his hand." T.619-20. At the

time petitioner made those statements to James, James was not familiar with the Saunders'

murder and did not know when it had occurred. T.620. Petitioner mentioned an ex-prostitute

named Laura Rose ("Rose") and asked James to contact her for petitioner. *Id.* James made

several phone calls to Rose but only was able to get in touch with her mother. T.620-21. After

petitioner made the foregoing statements to James, James contacted A.D.A. Marusak and they

eventually met. James explained that the felony (possession and sale of $60-worth of cocaine to

an undercover officer) to which he had pleaded guilty at the time he was being housed with

petitioner carried a sentence of four to eight years. T.621-22. After sharing the information

revealed by petitioner, James asked A.D.A. Marusak to lower his sentence. The prosecutor

agreed, and reduced James' sentence to a term of three to six years and recommended the

"SHOCK camp" incarceration program and a work-release program. The prosecutor also

promised to write to the parole board to let them know of James' cooperation in regard to

petitioner's case. T.623. However, James was not accepted into the program or the work-release

program. T.622-23. At the time of trial, James still was incarcerated. T.623. James admitted that

between 1988 and 1993 he had been convicted of six misdemeanors, including criminal trespass;

possession of stolen property and burglar's tools; criminal mischief; criminal facilitation; and an

instance of sexual misconduct in which he had intercourse with and impregnated his thirteen-

year-old daughter when he was twenty-one years-old. T.623-24, 630-32. He also had a felony

conviction for burglarizing an auto shop in 1990. T.636-37.

Carr's testimony before the grand jury on August 17, 1993, was read into evidence at his

trial. Carr admitted to knowing the victim "[f]rom the strip on Elmwood [Avenue], having "first

met him . . . at a bar called Faherty's" in March 1993. T.678-79. Carr testified that the victim was

"very well known on the strip" as a "jovial . . . guy."   "[W]ithin a week and a half" after Carr

met him, Carr volunteered to "start supplying prostitutes" for the victim in exchange for money.

T.679-80; 686-87. Before Carr made this proposition, Carr had seen the victim with about a

dozen prostitutes. T.680-81. Carr testified that sometimes, when he brought prostitutes to the

victim's house, he "stayed and joined in at [the victim's] request." T.682. Carr testified that on

the night of July 1, 1993, he was not on Elmwood Avenue; he was at Deborah Moore's house at

425 Porter on the West Side. T.778. He arrived there at about 3:00 or 4:00 p.m. *Id.* He left

between 9:00 and 10:00 a.m. on July 2, 1993.

The medical examiner testified that the victim sustained thirty-one stab wounds as a

result of a "[r]emarkable force." T.748. He found no defensive wounds on the victim's body.

T.747. To a reasonable degree of scientific certainty, the cause of the victim's death was the stab

wound to the aorta. T.750-51. Based on, *inter alia*, the rigidity of the victim's body, the medical examiner placed the time of death in the early morning hours of July 2, 1993 (*e.g.*, between 1 a.m. and 6:30 a.m.). T.755-56.

A.D.A. Carrington, the prosecutor who tried Carr on the burglary charge in 1994, testified regarding the previous proceeding. A.D.A. Carrington stated that she had never disclosed to anyone that the victim was holding a blank check when his body was found, a detail which Carr had revealed to the jailhouse information. T.816. On cross-examination, A.D.A. Carrington testified that she did not specifically recall turning over the copy of the blank check to the prosecutor who presented the burglary case to the grand jury. T.816-17.

The jury returned a verdict convicting Carr of two counts of felony murder and one count of first degree robbery and acquitting him of the counts charging intentional murder and criminal possession of a weapon. He was sentenced to twenty-five years to life on the felony murder-burglary charged, that term to run concurrently to his earlier sentence on the 1994 burglary conviction arising out of the Saunders incident. Carr also was sentenced to a term of twenty-five years to life on the felony murder-robbery conviction, that sentence to be served consecutively to the sentence for the felony murder-burglary conviction for an aggregate total of thirty-seven and one-half years to life in prison.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction on December 30, 1999. *People v. Carr*, 267 A.D.2d 1062 (App. Div. 4th Dept. 1999). Leave to appeal to the New York Court of Appeals was denied on June 23, 2000. *People v. Carr*, 95 N.Y.2d 833 (N.Y. 2000). On May 11, 2001, Carr filed a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") §

Case 1:01-cv-00689-RJA-VEB   Document 21   Filed 05/10/07   Page 12 of 45


440.10. The trial court denied the motion in a memorandum decision and order dated June 29, 2001. Carr did not seek leave to appeal the denial of the C.P.L. § 440.10 motion.

This habeas petition followed in which Carr asserts the following grounds for relief: (1) the trial judge erroneously denied his motion for recusal; (2) his subsequently prosecution for felony murder-burglary, after having been convicted previously of burglary, violated the Double Jeopardy clause; (3) his subsequent prosecution for felony murder-burglary, after having been convicted previously of burglary, violated the doctrine of collateral estoppel; and (4) trial counsel provided ineffective assistance. For the reasons set forth below, the Court recommends that Carr's petition for a writ of habeas corpus be denied and that no certificate of appealability issue with respect to any of Carr's claims, as he has failed to make a substantial showing of a denial of a constitutional right, pursuant to 28 U.S.C. § 2253(c)(2).

## III.   Discussion

### A.   Standard of Review

The filing of Carr's petition post-dates the amendment of the federal habeas corpus statute on April 24, 1996, by the enactment of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"). AEDPA has "significantly curtailed the power of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Pursuant to AEDPA, when a state court has adjudicated a habeas petitioner's claims on the merits, habeas relief may not be granted unless the state court's holding was contrary to, or was an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or was based on unreasonable determination of the facts in light of the evidence presented in petitioner's state

court proceeding. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams*, 529 U.S. at 412-13. In order to grant

the writ there must be "some increment of incorrectness beyond error," although "the increment

need not be great; otherwise, habeas relief would be limited to state court decisions so far off the

mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)

(internal quotation marks omitted).

### B.      Analysis of the Petition

#### 1.      The Trial Judge's Denial of Petitioner's Recusal Motion Did Not Violate Due Process

Petitioner contends that the trial judge who presided over the murder trial and the earlier

burglary trial should have recused herself because she was biased against him. As evidence of

alleged bias, petitioner points only to his dissatisfaction with a pre-trial ruling made during the

first trial regarding the scope of the prosecution's ability to cross-examine him about prior crimes

and misconduct; the court's refusal to unshackle him at a pre-trial hearing; and certain comments

made by the court during the sentencing on the 1994 burglary conviction. On direct appeal, the

Appellate Division rejected his contention that the trial court erred in denying his motion for

recusal because the record did "not establish any bias or prejudice on the part of the court[.]"

*People v. Carr*, 267 A.D.2d at 1062 (citing *People v. Brunner*, 182 A.d.2d 1123, 1123 (App. Div.

4th Dept.), *lv. denied*, 80 N.Y.2d 828 (N.Y. 1992)).

Respondent contends that petitioner's recusal claim, because it is based only on personal

bias, does not state a colorable due process issue cognizable on federal habeas review and that it

is also unexhausted because petitioner did not fairly present it as a federal constitutional claim to

the state appellate court.

The Second Circuit has explained that the exhaustion doctrine requires a state prisoner seeking a writ of habeas corpus to first give the state courts "a fair opportunity to pass upon his federal claim." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*). To satisfy this requirement, the petitioner need only have "fairly presented" his claim to the state courts; he need not cite "chapter and verse" of the federal constitution. *Id.* at 190-91. It is sufficient if, in his arguments to the state courts, he (1) relied on federal case law employing federal constitutional analysis; (2) relied on state case law employing federal constitutional analysis in similar fact situations; (3) asserted "the claim in terms so particular as to call to mind a specific right protected by the Constitution;" or (4) alleged a factual situation "well within the mainstream of constitutional litigation." *Id.* at 194.

The Court has reviewed Carr's appellate brief and, even though the brief did not recite the words "due process" or point explicitly to the Fourteenth Amendment, Carr argued that he was denied a fair trial because the trial judge was not conducting herself in a manner which promoted public confidence in the judiciary's integrity and which caused her impartiality to be questioned. *See* Petitioner's Appellate Brief at 11, Respondent's Exhibit B. As the Supreme Court has held, there exists a "judicial obligation to avoid prejudgment correspond[ing] to the litigant's right, protected by the Due Process Clause of the Fourteenth Amendment, to 'an impartial and disinterested tribunal in both civil and criminal cases,'" *Republican Party of Minnesota v. White*, 536 U.S. 765, 813 (2002) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)). *See also In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o man is permitted to try cases where he has an interest in the outcome."). The Court finds that petitioner's recusal argument in his appellate brief suffices to have "fairly presented" the claim under the standard articulated in *Daye*, 696

-14-

F.2d at 194. *Accord, e.g., Elmore v. Henderson*, No. 85 Civ. 579 (WCC), 1986 WL 10284, *2

(S.D.N.Y. Sept. 9, 1986) ("[Petitioner]  asserts that it was error for the trial judge to refuse to

recuse himself. He alleges first that the judge was biased against him as revealed by several

comments the judge made during the course of the trial. . . . [Petitioner] presented these same

contentions in his brief to the Appellate Division. The brief repeatedly stated that in view of these

circumstances, the trial judge's failure to recuse himself deprived [petitioner] of a "fair trial."

Thus, even though the brief did not recite the words "due process" or expressly point to the

fourteenth amendment, the allegations should have made it clear to the court that [petitioner] was

complaining that he had not been accorded an impartial hearing as mandated by the federal

constitution. The exhaustion doctrine requires no more than this."). The Court therefore

recommends that the recusal claim be found to have been exhausted.

    However, the Court finds that, although exhausted, petitioner's recusal claim is without

merit. As respondent correctly notes, the Supreme Court has held that "most matters relating to

judicial qualification [do] not rise to a constitutional level." *FTC v. Cement Institute*, 333 U.S.

683, 702 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)). In *Tumey*, the Supreme Court

distinguished between the due process requirement that a judge recuse himself when he has a

"direct, personal, substantial, pecuniary interest" in the outcome of the case, and what it

considered "matters of kinship, personal bias, state policy, [and] remoteness of interest[.]"

*Tumey*, 273 U.S. at 523. Here, the only allegations of bias on the part of the trial judge were that

she "had presided over the earlier prosecution of Mr. Carr, for Burglary in the Second Degree[,]

and made disparaging remarks and stated her contempt for Mr. Carr, on the record, during

sentencing." Petitioner's Appellate Brief at 11. Carr also claims that  "rulings made by the trial

-15-

judge, caused the defendant to be concerned over whether he would receive a fair trial[.]" *Id.* In this regard, Carr points to the trial judge's refusal to allow Carr to be unshackled during a pre-trial hearing so that he "'could take notes and have a more active part in the . . . hearing and [the trial judge] did not allow that for [her] own reasons and, of course, is something that prohibited him [sic] and led him to believe that [she] cannot be fair and impartial[.]'"*Id.* (quoting T.4-8). In addition, Carr claims that the trial judge's bias was evident in her failure, *sua sponte*, to strike allegedly improper comments made by the prosecutor or issue curative instructions. *See id.* at 12-13.

The Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). Apart from a judge's surrounding comments or accompanying opinion, judicial rulings, in and of themselves, "cannot possibly show reliance upon an extrajudicial source" and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved." *Id.* In almost every case, judicial rulings are rather "proper grounds for appeal, not for recusal." *Id.* Thus, the trial judge's ruling in which she refused to allow Carr to be unshackled during a pre-trial hearing and her failure to *sua sponte* address alleged misconduct by the prosecutor do not come within hailing distance of judicial bias. *See id.* The Court notes that the strength of defense counsel's argument that trial judge failed in correcting the prosecutor is greatly undermined by his lack of objection to the purportedly improper comments.

With respect to the disparaging remarks about Carr allegedly made by the trial judge, the Supreme Court has held that "opinions formed by the judge on the basis of facts introduced or

events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* Thus, remarks by a judge that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Such remarks "may do so if they reveal an opinion that derives from an extrajudicial source" and "will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* In support of his recusal motion, defense counsel pointed to the trial judge's statements made after Carr's burglary conviction in August 1994 that she "felt his testimony was totally unbelievable and preposterous and that he not be released from custody of this State['s] Department of Corrections one day sooner than his maximum[.]" S.5.[7] Arguably, this comment is not necessarily improper. However, assuming, for purposes of argument, that it was, it should be recognized that a judge is only human, being ordinarily imbued with a strong sense of duty and responsibility to the community. In his or her conscientiousness, the judge will sometimes speak out in frustration and even anger. The Supreme Court has held that such "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id.* In short, these comments do not evidence the extraordinarily "high degree of favoritism . . . antagonism" to support a bias challenge. *Compare with Berger v. United States*, 255 U.S. 22, 28 (1921) (In a World War I espionage case against German-American defendants, the district judge commented, "One must have a very judicial mind, indeed, not [to be] prejudiced against the

---

[7]        Citations to "S.___" refer to the transcript of the sentencing hearing.

German Americans" because their "hearts are reeking with disloyalty.") (internal quotation marks

omitted) (cited in *Liteky*, 510 U.S. at 556) (stating that the judge's comments in *Berger*, 255 U.S.

at 28, were an example of the type of judicial comments that revealed such a high degree

antagonism as to make fair judgment impossible). Accordingly, the Court recommends that

Carr's claim that the trial judge erroneously failed to recuse herself be dismissed.

### 2. Petitioner's Prosecution for Felony Murder did not Violate the Fifth Amendment's Double Jeopardy Clause

The Fifth Amendment of the Constitution provides in relevant part as follows:

> No person shall be held to answer for a capital, or otherwise infamous crime,
> unless on a presentment or indictment of a Grand Jury, except in cases arising in
> the land or naval forces, or in the Militia, when in actual service in time of War or
> public danger; nor shall any person be subject for the same offence to be twice put
> in jeopardy of life or limb[.]

U.S. CONST. amend. V. Carr argues that the Double Jeopardy clause of the Fifth Amendment

precludes his prosecution and conviction for felony murder on an underlying theory of burglary

due to his earlier conviction in 1994 for second degree burglary, based on his having admitted

breaking into the victim's house prior to the murder.

In August 1994, Carr was convicted of second degree burglary (N.Y. Penal Law §

140.25(2)) based on his unlawful entry into the victim's house on or about July 1, 1993. He was

sentenced to twelve and one-half to twenty-five years in prison on that conviction. Later, after

further police investigation uncovered additional evidence linking Carr to the July 1993 murder

of Percy Blake Saunders, Carr was re-indicted on three counts of second degree murder (two

counts of felony murder and one count of intentional murder), one count of first degree burglary,

one count of first degree robbery, and one count of third degree criminal possession of a weapon.

Following defense counsel's challenge to the validity of charging Carr with both burglary and

felony murder with burglary as the underlying felony, when Carr previously had been convicted

of burglary based on the same facts, the prosecutor withdrew the count of the indictment re-

charging first degree burglary. As recited above, the trial court denied defense counsel's motion

to dismiss the count alleging felony murder-burglary, the rationale being that the crime of

burglary was complete when the defendant unlawfully entered a dwelling with the intent to

commit a crime therein and was separate and distinct from felony murder, which requires a

killing. *See People v. Berzups*, 49 N.Y.2d at 427; T.37-40.

Defense counsel argued to the trial court that the prosecution failed to establish that Carr

had the intent to commit a crime other than the murder of the victim. According to petitioner, if

his unlawful purpose for entering the victim's dwelling were to murder him, then the burglary

and felony murder-burglary charges were the same and subjected petitioner to prosecution twice

for the same offense. *See* Petitioner's Appellate Brief at 16. Defense counsel contended that

without sufficient evidence that the crime of burglary was completed at the time the victim was

murdered, the felony murder-burglary conviction violated due process. *See id.* at 17.

Thus, one of the principle premises of defense counsel's argument at trial was that the

Double Jeopardy clause requires all charges that stem from a criminal act be charged in the same

criminal proceeding. *See* T.42. A majority of the Supreme Court, however, has never endorsed

the "same transaction test" proposed by Justice Brennan in his concurring opinion in *Ashe v.

Swenson*, 397 U.S. 436, 453-54 (1970), which dealt with the interplay between collateral

estoppel and Double Jeopardy. Under the "same transaction" test, the prosecution would be

required to join all of the charges as to each defendant in a single criminal trial. Justice Brennan

-19-

argued for rejecting the "same offense test" on the basis that it virtually annulled the prohibition against Double Jeopardy, but a majority of the Supreme Court has never adopted such a rule of compulsory joinder as a constitutional requirement. *See also Thompson v. Oklahoma*, 429 U.S. 1053 (1977) (Brennan, J. dissenting from a denial of *certiorari*) (citations omitted). Thus, contrary to petitioner's contention in the trial court and here, the Double Jeopardy clause did not require that he be charged with all of the potential criminal charges stemming from Saunders' murder in the same criminal proceeding. *E.g.*, *Moton v. Swenson*, 488 F.2d 1060, 1061 (8th Cir. 1973) (Because the Double Jeopardy clause does not mandate that separate charges arising out of the same episode be tried together, there was no constitutional violation in trying defendant in successive criminal proceedings for robbing a gas station's two attendants during one incident); *Brown v. Ohio*, 432 U.S. 161, 168-169 (1977); *United States v. Brooklier*, 637 F.2d 620, 624 (9th Cir. 1981); *United States v. Lai Ming Tanu*, 589 F.2d 82, 83 (2d Cir. 1978) ("This appeal raises questions concerning delay in bringing a defendant to trial in the federal court after dismissal of state charges arising out of the same transaction. There is no problem of double jeopardy, *United States v. Lanza*, 260 U.S. 377 , 43 S. Ct. 141, 67 L. Ed. 314 (1922); *Abbate v. United States*, 359 U.S. 187, 79 S. Ct. 666, 3 L. Ed.2d 729 (1959).").

The Supreme Court thus has construed the Fifth Amendment to the federal Constitution to merely preclude retrial of the same "offense," holding that in both the multiple punishment and multiple prosecution contexts, "where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." *United States v. Dixon,* 09 U.S. 688, 696 (1993) (citing *Brown v. Ohio*, 432 U.S. at 168-69; *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (multiple punishment); *Gavieres v. United States*, 220

U.S. 338, 342 (1911) (successive prosecutions)). The "same elements test," generally referred to

as the "*Blockburger* test," asks "whether each offense contains an element not contained in the

other; if not, they are the 'same offence' and double jeopardy bars additional punishment and

successive prosecution." *Id.*

     As a matter of New York law, felony murder[8] and burglary[9] are not the same offense; they

are "substantively and generically entirely separate and disconnected offenses." *People v.*

*Berzups*, 49 N.Y.2d at 427 (citing *People v. Nichols*, 230 N.Y. 221, 226 (1921)). "In contrast to

the usual lesser included offense situation, in felony murder the underlying felony is not so much

an element of the crime but instead functions as a replacement for the *mens rea* or intent

necessary for common-law murder." *Id.* at 427. Stated another way, the underlying felony at

issue in Carr's case–burglary–was not a lesser included offense of felony murder. *People v.*

*Santana*, 55 N.Y.2d 673, 674 (N.Y. 1981); *compare with Brown v. Ohio*, 432 U.S. at 168.

     In *Brown*, the two crimes at issue were joyriding (taking or operating a vehicle without

the owner's consent) and auto theft (joyriding with the intent permanently to deprive the owner

of possession), making joyriding the lesser included offense of auto theft. The Supreme Court

noted that a prosecutor who has established joyriding need only prove the requisite intent in order

---

     [8]       "A person is guilty of murder in the second degree when [] acting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, criminal sexual act in the first degree, sexual abuse in the first degree, aggravated sexual abuse, escape in the first degree, or escape in the second degree, and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants[.]" N.Y. Penal Law § 125.25(3).

     [9]       "A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when[ ] [t]he building is a dwelling." N.Y. Penal Law § 140.25(2).

to establish auto theft; the prosecutor who has established auto theft necessarily has established joyriding as well. Applying the *Blockburger* "same offense test" to Brown's case, the Supreme Court held that joyriding and auto theft constituted "the same statutory offense" within the meaning of the Double Jeopardy clause because it was clearly not the case that each statute required proof of a fact which the other did [not]. As was "invariably true of a greater and lesser included offense," the lesser offense of joyriding required no proof beyond that which was required for conviction of the greater offense of auto theft.  Therefore, the greater offense was, by definition, the "same" under *Blockburger*, for purposes of Double Jeopardy, as any lesser offense included in it.

Under New York Law, a felony murder prosecution based on an underlying uncharged burglary would *not* permit the trial court to submit a burglary charge to the jury as a lesser included offense. *See People v. Berzups*, 49 N.Y.2d at 427; *see also Brown v. Ohio*, 432 U.S. at 168-69. Furthermore, a conviction for felony murder can be supported even in the absence of a completed felony. *See* N.Y. Penal Law § 125.25(3). New York courts have held that verdicts acquitting a defendant of the underlying felony yet convicting him of felony murder are not necessarily repugnant or inconsistent. *E.g.*, *People v. Ponder*, 77 A.D.2d 223, 231 (App. Div. 4th Dept. 1980) ("Nor is there any basis for defendant's claim that the felony murder conviction should be set aside because he was acquitted of the robbery. Robbery is not a lesser included offense of felony murder, nor are the elements of the crimes the same. There is neither repugnancy nor inconsistency in a jury verdict acquitting one of robbery while convicting him of felony murder, which requires in common with robbery only an intent to commit the latter crime. A completed robbery is not an essential element of felony murder.") (internal citation omitted),

*aff'd*, 54 N.Y.2d 160 (N.Y. 1981).

Although the New York state courts have spoken clearly on this issue and have held that felony murder and the underlying felony charge constitute the "same offense" for purposes of Double Jeopardy, the Second Circuit and the Supreme Court have not directly so ruled. In *Boyd v. Meachum*, 77 F.3d 60, 64 (2d Cir.), *cert. denied sub nom. Boyd v. Armstong*, 519 U.S. 838 (1996), petitioner was convicted, after a jury trial of burglary in the first degree and felony murder, among other charges. Petitioner appealed just his felony murder conviction on the ground that the state had failed to establish probable cause to try him for that crime, and the state court of appeals agreed, reversing the felony murder conviction. The state re-charged petitioner with felony murder, and his motion to dismiss the indictment on Double Jeopardy grounds was denied. The question before the Second Circuit was whether petitioner's re-trial for felony murder would violate Double Jeopardy.  The *Boyd* panel, however, declined to decide whether the burglary conviction and the pending felony murder charge constituted the "same offense" for purposes of Double Jeopardy and relied upon other grounds to hold that petitioner's re-trial would not violate Double Jeopardy.  *Id.* at 64.

Similarly, the Supreme Court has never explicitly addressed whether, in the felony murder context, a prosecution for a felony bars a subsequent prosecution for felony murder using the earlier felony as the underlying crime. In *Harris v. Oklahoma*, 433 U.S. 682 (1977), petitioner's cohort shot and killed a grocery store clerk during the course of a robbery by the two men. Petitioner was convicted of felony murder. Nevertheless, he was thereafter brought to trial and convicted on a separate information charging the robbery with firearms, after denial of his motion to dismiss on the ground that this prosecution violated the Double Jeopardy Clause of the

Fifth Amendment on the basis that he had been already convicted of the offense in the felony murder trial. 433 U.S. at 682. The Supreme Court reversed the conviction, holding that where "conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one." *Id.* at 682-83 (citing *In re Nielsen*, 131 U.S. 176, 188 (1889) and *Brown*, 432 U.S. at 168-60). However, as respondent argues here, neither *Harris* nor *Nielsen* established the converse proposition–that conviction for a crime involving fewer elements (*e.g.*, burglary) would bar a later prosecution for a crime that included some of the same elements (*e.g.*, felony murder). Thus, *Harris v. Oklahoma* does not support petitioner's argument as that case did not hold, in the felony murder context, that a prosecution for a felony bars a subsequent prosecution for felony murder using the earlier felony as the underlying crime. Stated another way, there is no clearly established Supreme Court precedent standing for the proposition urged by petitioner here–that his August 1994 conviction for burglary barred the prosecution from subsequently charging him with felony murder based on an underlying felony stemming from the same incident of burglary.  Accordingly, petitioner's 1994 conviction for felony murder-burglary did not violate the Fifth Amendment's prohibition against Double Jeopardy. The Court therefore recommends that this claim be denied.

> **3.    Petitioner's Prosecution for Felony Murder Did Not Violate
> Principles of Collateral Estoppel**

Carr urges that his conviction should be overturned because the felony murder-burglary

violated principles of collateral estoppel[10] as set forth in C.P.L. 40.20, New York's statutory

Double Jeopardy provision, which "generally prohibits successive prosecutions for two offenses

based on a single act or criminal transaction[.]" *People v. Bryant*,  92 N.Y.2d 216, 226 (N.Y.

1998) (citing *People v. Abbamonte*, 43 N.Y.2d 74, 81 (1977)). Section 40.20(2) provides that "a

person may not be separately prosecuted for two offenses based upon the same act or criminal

transaction[.]" N.Y. Crim. Proc. Law § 40.20(2). In fact, C.P.L. § 40.40(1) prohibits the

prosecutor from conducting separate prosecutions against a defendant with respect to criminal

conduct arising from a single criminal transaction "[w]here two or more offenses are joinable in a

single accusatory instrument against a person by reason of being based upon the same criminal

transaction," pursuant to C.P.L. 200.20(a).  N.Y. Crim. Proc. Law § 40.40(1). C.P.L. 200.20(a) in

turn provides that two offenses are "joinable" when they are "based upon the same act or upon

the same criminal transaction," as that term is defined in C.P.L. § 40.10(2). N.Y. Crim. Proc.

Law § 200.20(2)(a). C.P.L. § 40.10(2) defines "criminal transaction" as "conduct which

establishes at least one offense, and which is comprised of two or more or a group of acts either

(a) so closely related and connected in point of time and circumstance of commission as to

constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as

---

[10]     "'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer*, 242 U.S. 85, 37 S. Ct. 68, 61 L. Ed. 161 [(1916)]. . . .The ultimate question to be determined, then, in the light of *Benton v. Maryland*, [395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed.2d 707 (1969)], is whether this established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy. We do not hesitate to hold that it is. For whatever else that constitutional guarantee may embrace, *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 [(1969), *overruled on other grounds by Alabama v. Smith*, ,490 U.S. 794, 795 (1989)], it surely protects a man who has been acquitted from having to 'run the gantlet' a second time. *Green v. United States*, 355 U.S. 184, 190, 78 S. Ct. 221, 225, 2 L. Ed.2d 199 [(1957)]." *Ashe v. Swenson*, 397 U.S. at 445-46 (footnote omitted).

to constitute elements or integral parts of a single criminal venture." N.Y. Crim. Proc. Law §
40.10(2)(a), (b). A straight reading of C.P.L. § 40.20(1) and § 40.20(2) *in isolation* seems to
support Carr's argument that his subsequent trial for felony murder was in violation of that
statute's prohibition against separate prosecutions for the same criminal transaction; obviously,
Carr's burglary of the victim's house and the murder occurred at the same time and were so
closely related in their purpose so as to be part of the "same criminal transaction" *see* C.P.L. §
40.10(2), and therefore were "joinable" as such, *see* C.P.L. § 200.20(2)(a).

However, Carr rather conveniently has ignored a statutory exception to C.P.L. § 40.20's
prohibition against separate prosecutions for the same criminal transaction. C.P.L. § 40.40(2)
states that when one offense (*i.e.*, Carr's burglary of Saunders' house on July 1, 1993) in a series
of two or more statutorily "joinable" offenses (*i.e.*, the burglary and the felony murder of
Saunders that occurred during Carr's burglary of his house) is charged in one indictment, and
another is not charged in that same indictment, *despite the fact that* the prosecution "possess[es] .
. . legally sufficient to support a conviction of the defendant for such uncharged offense (*i.e.*, the
felony murder based on the burglary)," "any subsequent prosecution for the uncharged offense is
thereby barred." N.Y. Crim. Proc. Law § 40.40(2) (emphasis supplied). In other words, if the
prosecution possesses "legally sufficient evidence" to support a conviction with respect to *all* of
the "joinable" offenses, and it fails to join them in the same indictment, it *may not* subsequently
take a defendant to trial on the uncharged joinable offenses. However, if the prosecution does *not*
possess "legally sufficient evidence" to convict the defendant on all of the "joinable" offenses, it
*may* commence a second prosecution of the defendant on the uncharged joinable offenses. The
latter scenario is the one presented by Carr's case. Invocation of this statutory exception, codified

-26-

at C.P.L. § 40.40(2), clearly is warranted given the facts and circumstances of Carr's case.

At the time of Saunders' murder, after the police obtained Carr's confession to the burglary in the summer of 1993, the prosecution obviously suspected that he was involved in the murder and that an indictment against him charging the joinable offenses of burglary and felony murder-burglary was possible. However, at that time, Carr steadfastly maintained that he had nothing to do with the murder and that nobody was in Saunders' house at the time that he broke in and committed the burglary. When the prosecutor presented the case to the grand jury in 1993, it only possessed his written statement to the police admitting that he feloniously entered the victim's house looking to steal money. The Court does not have the transcript of the grand jury proceedings from 1994 criminal proceeding, but it notes that the grand jury indicted Carr for second degree burglary but did *not* find probable cause to indict him for felony murder. Given that a refusal to indict reflects only a finding of no probable cause, *a fortiori*, the prosecution was not in "possession . . . of *legally sufficient  evidence to support a conviction* of the defendant for such uncharged offense," C.P.L. § 40.40(2) (emphasis supplied), of felony murder-burglary at the time Carr was indicted the first time. Consequently, it was *not* barred from commencing a subsequent prosecution against Carr for the uncharged felony murder-burglary once it obtained stronger evidence of his guilt, *see* N.Y. Crim. Proc. Law § 40.40(2)–namely, Carr's jailhouse admissions to James that occurred during his incarceration following his first trial. James testified in the second grand jury proceeding and at the second trial that Carr admitted killing Saunders by stabbing him numerous times and that he had beat [sic] the murder charge . . . [i]n

the grand jury." T.618.[11]

There was no state law statutory bar to prosecuting Carr for felony murder-burglary in 1996 after he had been convicted of burglary in 1994, since the prosecution did not have sufficient evidence to support a felony murder conviction against Carr at the time of the first trial. *E.g.*, *People v. DeMarco*, 167 A.D.2d 640, 562 N.Y.S.2d 863, 864 (App. Div. 3d Dept. 1990) ("[T]he People established that at the time of the previous prosecution for burglary, they did not possess legally sufficient evidence to support a conviction for forgery against defendant (C.P.L. § 40.40(2). Therefore, separate prosecutions were permissible and [the] County Court's refusal to dismiss the forgery indictment was proper."); *People v. Fletcher*, 13 Misc.2d 5, 22448 N.Y.S.2d 366, 375 (N.Y. Sup. Ct. 1982) ("[Though] [t]he possessory offenses, to which defendant Fletcher pled guilty, and the charge of third degree burglary were joinable . . . , the defendant's guilty plea does not bar prosecution for the burglary because of an exception to the joinder doctrine provided in [C.P.L. § 40.40((2))]. That exception permits a subsequent prosecution of the uncharged offense if, at the time of disposition (by plea or trial) under the first accusatory instrument, the People did not possess evidence legally sufficient to support a conviction of the uncharged offense. As previously discussed, the record supports the District Attorney's contention. The People's proceeding . . . is simply the culmination of a diligent investigatory process where

---

[11]        During a pre-trial argument concerning defense counsel's motion to dismiss certain counts of the indictment, the prosecutor argued that the People "should be allowed to prosecute [a felony murder-burglary charge] and that only makes sense, Judge, you have a situation where the felony is committed and there is not enough proof of a murder. The defendant should not be benefited [sic] by the fact that it took us a long time to uncover evidence legally sufficient to prosecute him. So this isn't a case where we had the evidence of the felony murder before we indicted him for the burglary; it was not until after that burglary indictment did we learn of admissions that this defendant made to witness Antonio James [the jailhouse informant]. So it's not like we were holding back, and prosecuted him on the burglary and then went back and prosecuted him for the murder when we had enough proof all along." T.37-40.

evidence essential to prove the more serious charge was only adduced subsequent to the defendant's plea of guilty on the misdemeanor complaint. Therefore, in the instant case, neither the letter nor intent of C.P.L. § 40.40 is contravened by prosecution of defendant Fletcher under the burglary count of the indictment."). Thus, Carr's subsequent prosecution for felony murder-burglary did not violate New York principles of collateral estoppel as set forth in New York's Double Jeopardy statute, C.P.L. § 40.20 .

As respondent now argues, Carr only framed his collateral estoppel argument as matter of state statutory law, C.P.L. § 40.20, which, by all accounts, appears to provide broader Double Jeopardy protections than the federal Constitution's Fifth Amendment. Respondent argues that, as a result, not only is the claim unexhausted because it was not fairly presented as a federal constitutional claim to the state courts, it does not even raise an issue of federal constitutional law cognizable on habeas review. The Court notes, however, that in *Ashe v. Swenson*, 397 U.S. 436, the Supreme Court was called upon to decide whether collateral estoppel, an "established rule of federal law[,] is embodied in the Fifth Amendment guarantee against double jeopardy." The Supreme Court declared that it did "not hesitate to hold that it [wa]s[,] [f]or whatever else that constitutional guarantee may embrace, *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076 [(1970)], it surely protects a man who has been acquitted from having to 'run the gantlet' a second time." *Id.* (quoting *Green v. United States*, 355 U.S. 184, 190 (1957)). Arguably, then, Carr asserted his collateral estoppel claim in terms "so particular as to call to mind a specific right protected by the Constitution," *Daye*, 696 F.2d at 194, or alleged a factual situation "well within the mainstream of constitutional litigation, *id.*" to have put the state appellate court on notice that he was asserting a federal claim. The Court thus is inclined to find

-29-

that Carr's collateral estoppel claim was "fairly presented" to the state courts.

However, the Court need not decide the "fair presentment" issue here because even if the claim remains unexhausted, Section 2254(b)(2) now authorizes the Court to deny it on the merits. *See* 28 U.S.C. § 2254(b)(2). In the interests of judicial economy and finality, the Court therefore will address the claim below. Regardless of which standard of review is used to measure the claim,[12] it should not provide a basis for habeas relief.

To the extent that Carr's petition can be interpreted as arguing that his subsequent prosecution for felony murder-burglary after being convicted of burglary violates federal principles of collateral estoppel, respondent contends that Carr is incorrect. In *United States v. Dixon*, the Supreme Court explained that

> [t]he collateral-estoppel effect attributed to the Double Jeopardy Clause, *see Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 25 L. Ed.2d 469 (1970), may bar a later prosecution for a separate offense where the Government has *lost* an earlier prosecution involving the same facts. But this does not establish that the Government "must . . . bring its prosecutions . . . together." It is entirely free to bring them separately, and can win convictions in both.

---

[12]     The Second Circuit has not yet articulated a standard for determining when unexhausted claims should be denied on the merits. A number of district court decisions in this Circuit have utilized a "patently frivolous" test for dismissing unexhausted claims under Section 2254(b)(2). *E.g.*, *Hammock v. Walker*, No. 99-CV-6354L(FE), 2002 WL 31190945, at *2 (W.D.N.Y. Sept. 17, 2002), *Wilson v. Goord*, No. 00 Civ.4849(LTS), 2004 WL 226149, at *6 (S.D.N.Y. 2004)). A minority of courts have expressed doubts as to whether meritless claims must meet the more exacting standard of "patently frivolous" to warrant denial, and have dismissed unexhausted claims under Section 2254(b) as "nonmeritorious" when it was "perfectly clear" that the petitioner did not "raise even a colorable federal claim." *E.g.*, *Basnight v. Keane*, No. 99-CV-5907(FB), 2001 WL 901139, at *5 n. 1 (E.D.N.Y. July 31, 2001); *Tatta v. Miller*, No. 05-CV-1205 (FB)(MG), 2005 WL 2806236, at *3 (E.D.N.Y. Oct. 27, 2005)). In many instances, however, the district courts have declined to adopt a particular standard, instead dismissing the unexhausted claims after finding that they failed under either standard (*i.e.*, "patently frivolous" or "nonmeritorious"). The Court notes that the Second Circuit opted for the "patently frivolous" test in *Jones v. Senkowski*, 2001 WL 1230800, at *4 (2d Cir. Oct. 5, 2001), but that decision was later vacated and withdrawn. *Jones v. Senkowski*, 2002 WL 246451 (2d Cir. May 22, 2002), *amended by Jones v. Senkowski*, 42 Fed. Appx. 485, 2002 WL 1032589 (2d Cir. May 22, 2002), *cert. denied*, 537 U.S. 1177 (2003)).

*United States v. Dixon*, 509 U.S. 688, 705 (1993) (emphasis in original) (cited in Resp't Mem. at 16 (Docket No. 10)). Respondent notes that the state won the first case, securing a second degree burglary conviction against petitioner. It then acquired additional evidence that petitioner had perpetrated the murder; there was no "issue of ultimate fact," for collateral estoppel purposes, regarding the murder that had been determined by a valid and final judgment in the burglary prosecution.

In order to establish that he is entitled to collateral estoppel's preclusive effect, the defendant "has the burden of establishing that the issue he seeks to foreclose from the second litigation was 'necessarily' resolved in his favor by the first verdict." *United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043 (1977)) (citing *United States v. Cala*, 521 F.2d 605, 608 (2 Cir. 1975); *United States v. Gugliaro*, 501 F.2d 68 (2 Cir. 1974); *United States v. Tramunti*, 500 F.2d 1334 (2 Cir.), *cert. denied*, 419 U.S. 1079 (1974)) (cited in Resp't Mem. at 16 (Docket No. 10)). The Second Circuit has noted that this burden of proof is a "heavy one" because "'it usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict.'" *Id.* (quoting *United States v. Gugliaro*, 501 F.2d at 70 and citing *United States v. Cala*, 521 F.2d at 609; *United States v. Cioffi*, 487 F.2d 492, 498 (2 Cir. 1973), *cert. denied sub. nom. Ciuzio v. United States*, 416 U.S. 995 (1974)).

Carr's case appears to present a relatively straightforward application of collateral estoppel, however. In the first prosecution for second degree burglary, the only issues of fact before the jury were whether (1) petitioner knowingly entered or remained unlawfully in (2) the victim's dwelling while (3) possessing the intent to commit a crime therein. *See* N.Y. Penal Law § 140.25(2). In the second prosecution for felony murder committed during the commission of a

burglary, the jury was charged with determining the following factual issues: whether (1)

petitioner committed or attempted to commit burglary and (2) whether in the course of and in

furtherance of the burglary, or in immediate flight therefrom, (3) he caused the victim's death.

*See* N.Y. Penal Law § 125.25(3). As mentioned above, in felony murder, the underlying

felony–here, the burglary–"functions as a replacement for the *mens rea* or intent necessary for

common-law murder[,]" *People v. Berzups*, 49 N.Y.2d at 427, but the *completion* of the

underlying felony is not an essential element of felony murder, *People v. Ponder*, 77 A.D.2d at

231. *See also People ex rel. Santangelo v. Tutuska*, 19 Misc.2d 308, 313 (N.Y. Sup. Ct. 1959)

("Though in a felony murder case, all of the ingredients of the underlying felony must be proved,

the defendant in such a homicide case could not . . .be convicted of an independent underlying

felony.") (citing *People v. Marendi*, 213 N.Y. 600, 611 (N.Y. 1915)); *People v. Giblin*, 115 N.Y.

196, 197 (N.Y. 1889) ("The purpose of proving participation in the commission of another felony

which leads up to and results in the homicide is entirely different than the one suggested by the

defendant. There can be no murder without evidence of malice and of a felonious intent and a

depraved mind."); *see also People v. Jackson*, 20 N.Y.2d 440, 450 (N.Y. 1967).

Felony murder and the underlying felony are "entirely separate and disconnected

offenses," *Berzups*, 49 N.Y.2d at 427, as are robbery in the first degree and criminal possession

of a weapon in the second and third degrees, *id.* (upholding convictions for felony murder,

intentional murder, robbery in the first degree and possession of a dangerous weapon where

defendants killed pharmacist during a holdup). The New York Court of Appeals moreover has

held that the dismissal of the underlying felony counts does not necessarily require dismissal of

the felony murder charge. *People v. Murray*, 40 N.Y.2d 327, 334 (N.Y. 1976) ("Defendant

contends nevertheless that the dismissal of the underlying felony counts perforce requires dismissal of the felony murder charge. However, we have only recently rejected that very argument[.]") (citing *People v. Dennis*, 33 N.Y.2d 996 (N.Y. 1974), *aff'g* 40 A.D.2d 959 (App. Div. 1st Dept. 1972) (holding that murder convictions on basis of felony homicide, the underlying felony being robbery, were not required to be reversed for alleged failure to give detailed charge of elements of robbery and of criminal attempt where it was established beyond a reasonable doubt that shooting occurred during robbery or attempted robbery, implicit in verdict was jury's acceptance of statements in defendant's confession indicating without a doubt his participation in attempted robbery involving the shooting)).

In sum, there was no violation of the doctrine of collateral estoppel as a matter of New York state or federal law in connection with Carr's prosecution on the charge of felony murder-burglary. Accordingly, the Court recommends that this claim be denied.

### 4.    Trial Counsel Provided Effective Assistance

Carr contends that trial counsel failed to provide effective assistance within the meaning of the Sixth Amendment of the Constitution because counsel (1) failed to interview and subpoena seven inmates incarcerated with petitioner and informant James in the Erie County Holding Center who allegedly could have provided information to discredit and impeach the testimony provided by James; and (2) neglected to "make use of three exculpatory documents" consisting of intra-departmental police correspondence, a memorandum prepared by an investigator working for the prosecutor, and the statement of witness Weise. Carr asserted these contentions in support of a motion to vacate the judgment pursuant to C.P.L. § 440.10 in 2001. The trial court denied the motion on the merits in a memorandum decision and order entered

June 29, 2001. *See* Resp't Ex. D. Carr did not seek leave to appeal the trial court's denial of the

motion to the Appellate Division, however. As such, respondent contends that petitioner's

ineffective assistance of counsel claims are unexhausted because he has not completed one

complete round of the available state court review procedures and by implication should

therefore be required to return to state court to exhaust his ineffective assistance claim.

The problem Carr now faces is that the thirty-day deadline for appealing this ruling has

expired. *See* N.Y. Crim. Proc. Law § 460.10(4)(a).  Thus, respondent asserts this means that

Carr's ineffective assistance claim, although unexhausted, must be deemed exhausted because he

faces the absence of corrective process in the state courts. *See Grey v. Hoke*, 933 F.2d 117, 120

(2d Cir. 1991). Indeed, this would be the result in many cases where a procedural rule would

make it fruitless to require the petitioner to pursue the claim in state court. *See*, *e.g.*, *Reyes v.*

*Keane*, 118 F.3d 136, 139 (2d Cir. 1997); *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994),

*cert. denied*, 514 U.S. 1054 (1995); *Reid v. Senkowski*, 961 F.2d 374, 377 (2d Cir. 1992). With

respect to the failure to seek leave to appeal the denial of a C.P.L. § 440.10 motion, however, the

Second Circuit has squarely held in *Pesina v. Johnson*, 913 F.2d 53 (2d Cir. 1990), that a federal

court may not assume that such a claim, when and if brought by an appellant in a state court

proceeding, will be procedurally defaulted in the state courts due to petitioner's failure to appeal

the denial of a C.P.L. § 440.10 motion within the thirty-day time-period set forth in C.P.L. §

460.10(4)(a).

In *Pesina*, the petitioner presented one claim on his direct appeal that had been exhausted.

Subsequently, he brought a C.P.L. § 440.10 motion asserting two new arguments–that his

sentence was excessive and that he was denied effective assistance of counsel. That motion was

denied but petitioner did not seek leave to appeal. He subsequently brought a habeas petition

raising the one claim he had raised on direct appeal (which was exhausted) and one of the claims

he had raised in support of his C.P.L. § 440.10 motion (which was unexhausted). Recognizing

that the petition had both exhausted and unexhausted claims, the district court dismissed the

petition in its entirety pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982). On appeal to the Second

Circuit, petitioner argued that because the statutory time limit for seeking leave to appeal the

denial of his C.P.L. § 440.10 motion had passed, see C.P.L. § 460.10(4)(a), he had in fact

exhausted the claims in that motion because there was "an absence of available State corrective

process[,]" 28 U.S.C. § 2254(b)(1)(B)(i). In other words, petitioner argued, it would be futile for

him to seek leave to appeal because the state appellate court would hold that his application was

untimely and would summarily dismiss it and by implication. Therefore, he contended, the

district court should have deemed his claim exhausted. See *Pesina*, 913 F.2d at 54. In rejecting

this argument, the *Pesina* court stated,

> While that statutory [limitations period] may ultimately be held by state courts to
> preclude them from reaching the merits of Pesina's ineffective assistance claim,
> he must still present that claim to the highest state court. We have no authority to
> declare as a matter of state law that an appeal from the denial of his original
> Section 440.10 motion is unavailable or that he cannot raise the ineffective
> assistance claim in a new Section 440.10 action. Until Pesina presents his claim to
> the highest court–whether or not it seems likely that he will be held to be
> procedurally barred–he has not exhausted available state procedures.

*Id.* (citation omitted). Accordingly, the Second Circuit affirmed the dismissal of the habeas

corpus petition without so that Pesina could return to state court and attempt to properly exhaust

his claim by appealing the denial of the C.P.L. § 440.10 motion. *Id.*

The rule in *Pesina* has been called into question by several district courts based on

Second Circuit's decisions in cases such as *Bossett v. Walker*, 41 F.3d at 828-20, and *Reyes v. Keane*, 118 F.3d at 139, which make clear that it is pointless to require a habeas petitioner to return to state court to pursue a claim that is obviously procedurally barred. *See, e.g.*, *Priester v. Senkowski*, No. 01CIV.3441(LMM)(GWG), 2002 WL 1448303, at *7 (S.D.N.Y. July 3, 2002) (questioning validity of *Pesina* but following its ruling; holding that "because Ground Three of the Petition was properly raised at least in part in Priester's § 440.10 motion–as recognized by the State Supreme Court decision itself–that motion must be treated as unexhausted by this Court."). Other district courts in this Circuit have held that *Pesina*'s concern that federal courts lack the "authority" to declare claims procedurally defaulted at the state level has been "put to rest" by the United States Supreme Court's decisions in *Coleman v. Thompson*, 501 U.S. 722, 735 (1991), and *Harris v. Reed*, 489 U.S. 255, 264 n. 9, 269-70 (1989). *E.g.*, *DeVito v. Racette*, 1992 WL 198150, at *2-5 (E.D.N.Y. Aug. 3, 1992) (petitioner failed to abide by 30-day time-limit for appealing from denial of C.P.L. § 440 motion; district court held that this "clearly suggests he will suffer procedural default should he return to state court" and dismissed petition in its entirety pursuant to Rose v. Lundy, (1982), because the claims were unexhausted); *compare with Thomas v. Greiner*,111 F. Supp.2d 271, 276-78 (S.D.N.Y. 2000) (holding that because the time to seek leave to appeal from the denial of petitioner's C.P.L. § 440.10 motion had long since passed, his habeas claim which had been raised therein was unexhausted but procedurally defaulted because he no longer had remedies available in the state courts) (citing *DeVito*, 1992 WL 198150, at *2-5; *Micelli v. LeFevre*, 444 F. Supp. 1187, 1189 (S.D.N.Y. 1978) (holding that state appeal of denial of collateral motion unavailable since no certificate granting leave to appeal was sought within the required time)).

According to the district court in *DeVito*, the holdings of *Coleman v. Thompson* and *Harris v. Reed* make it clear that under the circumstances present here, the district court should, contrary to the rule of *Pesina*, "'declare as a matter of state law that an appeal from the denial of his original Section 440.10 motion is unavailable.'" *DeVito*, 1992 WL 198150, at *4 (quoting *Pesina*, 913 F.2d at 54). The *DeVito* court pointed out that *Coleman* stated that federal courts may address habeas corpus petitions from state prisoners where "the last state court to which the petitioner presented his federal claims fairly appeared to rest its decision primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground." *Coleman*, 501 U.S. at 735. As a footnote to that statement the Supreme Court explained, "This rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the last state court to which the petitioner actually presented his claims." *Id.* at 735 n. 1 (citing *Harris v. Reed*, 489 U.S. at 269-70).

Although the Court is inclined to side with the persuasive reasoning of the district court in *DeVito*, it is mindful that it is not its place to deviate from the Second Circuit's clear directive in *Pesina*. *See, e.g. Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("'If a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions.'") (quoting *Rodriguez v. Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *accord Butts v. City of New*

*York Dept. of Housing Pres. and Dev.*, 990 F.2d 1397, 1409 (2d Cir. 1993). Based on this principle of *stare decisis*, this Court recommends following the holding of *Pesina* and recommends that Carr's ineffective assistance of counsel claim be held to be unexhausted but not procedurally defaulted on the specific ground that the statutory time limit for seeking leave to appeal the denial of his C.P.L. § 440.10 motion had passed. *See Pesina*, 913 F.2d at 54; *accord Priester*, 2002 WL 1448303, at *7.

However, the Court now has the authority, pursuant to 28 U.S.C. § 2254(b)(2), to deny a habeas petitioner's unexhausted claims on the merits. As discussed below, Carr's ineffective assistance of counsel claims fail either the "patently frivolous" or "nonmeritorious" test, the two standards utilized by the district courts in this Circuit  to have considered the issue so far. Moreover, they also fail under a pre-AEDPA standard of review.  Thus, it is appropriate for the Court to recommend reliance upon 28 U.S.C. § 2254(b)(2) in order to deny the habeas petition in its entirety, notwithstanding Carr's failure to exhaust state remedies. The Court will therefore consider Carr's claim of ineffective assistance on the merits under the foregoing discussion.

### a.    The *Strickland* Standard

In assessing a claim of ineffective assistance of counsel, the Court is guided by the two-pronged standard set forth by the Supreme Court in *Strickland v. Washington*,  466 U.S. 668, 687-88, 693-94 (1984). To prevail on such a claim, a defendant must show both that his attorney's conduct fell below an objective standard of reasonableness under prevailing professional norms, and that he was prejudiced by counsel's unprofessional conduct. The "prejudice" prong of the *Strickland* test requires the defendant to show that but for counsel's mistakes, there is a reasonable probability that the outcome of the trial would have been different.

*Id.* "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

### b.    Instances of Alleged Ineffectiveness

### 1.)    Failure to Interview and Call Witnesses

The decision "whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), *cert. denied*, 484 U.S. 958 (1987); *accord United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999).  Such decisions, "if reasonably made, will not constitute a basis for an ineffective assistance claim." *Id.*; *see also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), *cert. denied*, 538 U.S. 1021 (2003). Such tactical decisions generally do not rise to the level of a constitutional violation, and the habeas second-guess trial strategy simply because the chosen strategy has failed, *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir.1987), especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial, *United States v. Nersesian*, 824 F.2d at 1321.

Moreover, a petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance  merely by asserting that certain witnesses *might* have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. *1981*); *Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir.), *cert. denied sub nom. Gomez v. Procunier,* 469 U.S. 1041 (1984)

-39-

(petitioner failed to meet his burden of showing that uncalled witnesses would have testified favorably to the petitioner's case); *Rosario v. Bennett*, No. 01 Civ. 7142, 2002 WL 31852827, at *33 & n. 59 (S.D.N.Y. Dec. 20, 2002); *Cromwell v. Keane*, No. 98 Civ. 0013, 2002 WL 929536 at *24 (S.D.N.Y. May 8, 2002); *Greenidge v. United States*, No. 01 CV 4143, 2002 WL 720677 at *2 (E.D.N.Y. Mar. 27, 2002) (28 U.S.C.. § 2255 case; petitioner's ineffective assistance of counsel claim has no merit where petitioner "nowhere specifie[d] how the testimony of those witnesses [counsel purportedly failed to call] would have been helpful to his defense"); *Lou v. Mantello*, No. 98-CV-5542, 2001 WL 1152817, at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (citations omitted); *Muhammad v. Bennett*, No. 96 Civ. 8430, 1998 WL 214884, at *1 (S.D.N.Y. Apr. 29, 1998) (holding that petitioner's "speculative claim about the testimony of an uncalled witness" is insufficient to show ineffective assistance of trial counsel); *Burke v. United States*, No. 91 Civ. 468, 1992 WL 183752, at *2 (S.D.N.Y. July 22, 1992) (holding that petitioner's contention that he was denied effective assistance of counsel, where his attorney failed to subpoena several witnesses who would have aided his defense, was "wholly insufficient" given petitioner's "failure to set forth who the specific witnesses [we]re or their relevant testimony"); *Croney v. Scully*, CV-86-4335, 1988 WL 69766 at *2 (E.D.N.Y. June 13, 1988) ("Petitioner's contention that assignment of an investigator would have been helpful to his defense is conclusory and speculative. Petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial."), *aff'd*, 880 F.2d 1318 (2d Cir. 1989); *People v. Ford*, 46 N.Y.2d

1021 (N.Y. 1979) (holding that defendant not denied effective assistance of counsel due to counsel's failure to demonstrate that alleged alibi witnesses would have testified defendant was not in vicinity of robbery during its commission; rejecting contention that defense counsel's decision not to bring forth the witnesses was clearly prejudicial and not result of well-advised defense strategy). Thus, in order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial.

Here, Carr has failed to submit affidavits from any of the seven inmates who allegedly would have provided impeachment material against informant James, nor has he identified them, stated what their proposed testimony would have been, or indicated whether they would have been willing to testify in his favor at trial. Petitioner's assertion that the inmates would have testified favorably to his case thus is wholly speculative and is insufficient to show either that trial counsel's failure to call these witnesses was unreasonable or that he was prejudiced by the absence of their testimony at trial. Because Carr can meet neither prong of the *Strickland* test, the Court recommends that this aspect of his ineffective assistance of counsel claim be denied.

### 2.)    Failure to Utilize "Exculpatory" Documents

Carr argues that trial counsel was ineffective in failing to utilize, as part of the defense strategy that various other individuals had the opportunity and/or motive to murder the victim, the following "exculpatory" documents: (1) intra-departmental police correspondence memorializing observation of Nina Cornell ("Cornell") that the victim regularly patronized bars on Elmwood Avenue and "was prone to coming home with different women on various occasions"; (2) the statement of the victim's housekeeper, Carol Weise; and (3) a memorandum

prepared by an investigator employed by the prosecutor. However, as the state court found, the record belies petitioner's assertions, for trial counsel did elicit virtually all of the testimony contained in these allegedly "ignored" documents.  First, during his cross-examination of Weise, trial counsel specifically used information from her statement to show that various individuals had business or social relationships with the victim which permitted them easy access to the victim's home. In particular, trial counsel elicited information about "Gloria," a bartender, whom the victim had hired to make a pot roast for him and who "call[ed] to borrow money [from the victim] for gambling debts and [did not] even know him."

Through the testimony of Weise and Officer Masecchia, trial counsel sought to demonstrate that the victim frequented bars on Elmwood Avenue and may have invited a prostitute to his home. Cornell's observation that the victim was in the habit of bringing different women home with him was merely cumulative to that testimony. *See, e.g.*, *Cotto v. Lord*, No. 99 Civ. 4874, 2001 WL 21246, at *16 n. 6 (S.D.N.Y. Jan. 9, 2001) (rejecting claim that counsel was ineffective for failing to call additional family members where petitioner "made no showing as to which other family members should have been called, what their testimony would have been and why that testimony would not have been cumulative of what the petitioner and [other witness] could provide"), *aff'd*, No. 01-2056, 21 Fed. Appx. 89, 2001 WL 1412350 (2d Cir. Nov. 8, 2001) Thus, petitioner's claim that trial counsel's performance was deficient in failing to use the aforementioned "exculpatory" material lacks a factual basis. Moreover, petitioner cannot demonstrate that he was prejudiced in any way by counsel's performance, given that essentially all of the evidence which he claims counsel neglected to utilize in fact was put before the jury for its consideration. Accordingly, Carr cannot meet either aspect of the *Strickland* test, and the

Court recommends that habeas relief not issue on this aspect of his ineffective assistance of counsel claim.

IV.     **Conclusion**

For the reasons set forth above, the Court recommends that James Carr's petition for a writ of habeas corpus be **DENIED**.  Because the Court finds that Carr has failed to make a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), the Court further recommends that a Certificate of Appealability be **DENIED** as to all of Carr's claims.

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: May 10, 2007
          Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

-44-

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: Buffalo, New York
       May <u>10</u>, 2007.